UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

COALITION FOR A LEVEL PLAYING FIELD,
L.L.C., ET AL.,

                              Plaintiffs,

                - against -

AUTOZONE, INC., ET AL.,

                              Defendants.

1:04-cv-08450-RJH

**MEMORANDUM OPINION
AND ORDER**

Richard J. Holwell, District Judge:

　　This is a price discrimination action brought under the Robinson-Patman Act, 49 Stat.

1526, 15 U.S.C. § 13 (2006) ("Robinson-Patman" or the "Act").  Plaintiffs are solely owned auto

parts stores (the colloquial "mom and pop" shops, called "jobbers" in the industry); warehouses

that act as middle-men between such stores and the manufacturers of the parts they sell; and

Coalition for a Level Playing Field, L.L.C., a trade association apparently formed by plaintiffs'

counsel to conduct this litigation.[1]  Defendants are parts manufacturers as well as national "big

box" retail chains that they sell to, like Wal-Mart, Sam's Club, and Autozone.  The complaint

alleges that defendants are engaged in anticompetitive price discrimination in violation of the

Robinson-Patman Act, and that through that discrimination they are:

> destroying competition in the United States, resulting in fewer choices, the
> destruction of companies such as plaintiffs that provided better service to its
> customers, the destruction of jobs without any equivalent job being created by the
> Defendant Retailers, and a steady deterioration of the nation's economy in its
> present direction toward third-world status if the defendants' activities are not
> stopped.

---

[1] Although there are nominally 133 plaintiffs, all are represented by Mr. Carl Person and all have acted in unison for
the purposes of each submission to date.

1

(Second Amended and Supplemental Complaint [77] ("Compl." or "complaint") ¶ 89F.)

In support of its allegations, the complaint includes factual appendices demonstrating that these large chain stores charge low retail prices, sometimes even beating the prices that the plaintiff jobbers are charged by their wholesale middle-men distributors (some of whom are also plaintiffs). Defendants have moved to dismiss on two principle grounds: (i) because this action is precluded by *Coalition for a Level Playing Field v. Autozone Inc.*, No. 00 Civ. 953 (E.D.N.Y., filed Feb. 16, 2000) ("*Coalition I*"), a nearly identical action resolved in defendants' favor by a 2004 jury verdict; and (ii) for failure to state a claim, implicating the plausible pleading requirement set forth in *Bell Atlantic v. Twombly*, 550 U.S. 544, 554, 127 S. Ct. 1955, 1964, 167 L.Ed.2d 929 (2007). For the reasons that follow plaintiffs' complaint is dismissed in its entirety.


# I.   BACKGROUND

The complaint alleges that defendants engaged in anticompetitive conduct in the market for "aftermarket" auto parts—parts, such as windshield wipers and oil filters, that are designed to be installed in a vehicle after it is manufactured. In this section, the Court describes those allegations, then outlines the procedural history of this litigation, beginning with *Coalition I*. Because the case is before the Court on defendants' motion to dismiss, the Court takes the well-pled factual allegations of the complaint as true and draws reasonable inferences in plaintiffs' favor. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

## A.   The Complaint's Allegations

Each of the parties is, or was, involved in the auto parts industry. Plaintiffs, as noted, are 133 independent auto part distributors or retailers and a trade association, the Coalition for a Level Playing Field, L.L.C. ("Coalition"). (Compl. ¶ 6.) Coalition is a New Hampshire

corporation that was formed for the purpose of "eliminating the discriminatory pricing system in the auto parts aftermarket." (¶ 3.)

The defendants include both parts manufacturers and large vertically integrated distributor-retailers. The manufacturer defendants include major U.S. parts manufacturers such as Dana Corp., Ford Motor Co., Standard Motor Products, and Cardone Industries, among others. (¶¶ 27-57A.) The retailer defendants are AutoZone, Inc., Wal-Mart Stores, Inc., Sam's West Inc. (a Wal-Mart affiliate), Advance Auto Parts, and various of their affiliates. (¶¶ 7-26A.) For convenience, the Court refers to manufacturer defendants who participate in AutoZone's "pay on scan" program as the "AutoZone defendants," and to manufacturer defendants who participate in Wal-Mart's Radio Frequency Identification ("RFID") technology development program as the "Wal-Mart defendants." More on those programs is to follow.

The auto parts market operates through two primary distribution channels: one in which wholesalers perform traditional distribution and inventory functions, and one in which vertically-integrated retailers perform those functions, as well as advertise and promote auto parts and sell at retail. Plaintiffs operate in the first distribution channel. In this channel, manufacturers sell parts to independent warehouse distributors or "WDs," who either resell the parts to end users in a two-step distribution system or sell the parts in a three-step system to a "jobber"— for example, an auto parts store or a gasoline station—that then resells the parts to end users. (*See* ¶¶74B, 73N.) Defendants operate in the second distribution channel. In this channel manufacturers sidestep the distributors and sell parts directly to major retailers, such as Wal-Mart or AutoZone, who in turn sell to end users. (¶ 74A.)

Whether selling to a WD in the first channel or one of the defendant retailers in the second channel, manufacturers do not sell parts on a part-by-part basis. Instead, the

manufacturers enter into complex supply contracts with individual distributors and retailers through which the buyers obtain access to one or more "product lines," groups of related parts such as engine parts or batteries.  (¶¶ 60A, 70L.)  The contents of a product line are defined in a "blue sheet," which lists each part in the line and an undiscounted list price nominally charged to WDs.  (¶ 70L.)  Plaintiffs allege that the price they pay for a particular part can be calculated by reference to the blue sheet and a specific part.  (¶ 94.)  On the other hand the price the retailer defendants pay in the second channel is concededly the product of a complex, multivariable formula defined in a "vendor agreement" that the retailer enters into with a parts manufacturer. (¶ 95.)

Plaintiffs allege that the vendor agreements utilize a number of provisions, which are not available to them, to lower the effective net price the retailer defendants pay for auto parts.  These include: early buy allowances; defective merchandise allowances, obsolescence allowances; back haul allowances; volume discounts; deferred payment agreements unrelated to the retailers defendants' creditworthiness; free trucks; private brands; unjustified deductions from invoices; rebates and other payments representing a return of all or part of the purchase price paid by the defendants for goods of the manufacturer without return of the goods; and "other fees and allowances" paid by the manufacturers to the defendant retailers and not paid to the plaintiff WDs at all or in a proportionate amount.  (¶ 90.)  Plaintiffs believe that these deductions do not represent bona fide discounts for the value of services provided by defendants.  But aside from formulaic accusations of illegality, plaintiffs provide scant factual material to support this view. (*See, e.g.*, ¶ 90(E) ("[v]olume discounts given to the Major Retailers . . . and not made available to the plaintiffs"); ¶ 90(J) "[d]eductions without justification from invoices sent by the

Manufacturers to the defendants for goods sold to the defendants, representing cancellation of such invoices to the extent of the deductions and resulting free goods for the defendants".)

In count I of the complaint, plaintiffs allege that the manufacturer defendants have sold parts and lines to the retailer defendants at discriminatorily low prices.  Specifically, the complaint alleges on information and belief that the manufacturer defendants sell to the retailer defendants below their variable cost of production (¶ 80), and that on a net basis, the defendant retailers pay forty to fifty percent less for parts than plaintiffs.  (¶ 97; *see also* ¶ 99.)

Counts II and III are directed at two specific programs: AutoZone's "Pay on Scan" ("POS") Program and Wal-Mart's Radio Frequency Identification ("RFID") Technology Development Program.  Under the POS program, a manufacturer supplies parts to AutoZone at no cost until a particular part is scanned and sold at an AutoZone cash register.  (¶ 115B.) Although AutoZone maintains dominion and control over the parts in its store, the manufacturer assumes the risk of loss if a part is lost, destroyed, or becomes obsolete.  (¶ 115C.)  Title to a part passes to AutoZone the instant before it is sold to an end user, but then only momentarily and for tax reasons.  (¶ 115D.)

Plaintiffs contend that the POS program gives AutoZone an unjustified competitive advantage in the aftermarket parts market.  Because of the program, AutoZone can carry slower-moving parts within a product line without paying for them, whereas plaintiffs are required to pay defendants for such parts, usually within thirty days after receiving them.  (¶ 118.)  By reducing AutoZone's capital costs, the POS system also allows AutoZone to expand costlessly, thereby "driv[ing] all of the plaintiffs and other independent auto parts wholesalers, jobbers and retailers out of business . . . ."  (¶ 123.)  The complaint alleges that the POS program constitutes an

unlawful form of price discrimination that is prohibited by the Robinson-Patman Act.  (¶¶ 115C, 126A.)

Under Wal-Mart's RFID program, parts manufacturers must include an RFID chip in each pallet of goods shipped to a Wal-Mart warehouse.  (¶ 135.)  These chips allow Wal-Mart to closely monitor the location of parts using a computerized inventory-control system; the RFID program thus increases the probability that the appropriate quantity, size, color, and type of inventory will be available to meet consumer demand.  (Compl. ¶ 142A; *see generally* D. Zachary Hostetter, *When Small Technology Is a Big Deal: Legal Issues Arising From Business Use of RFID*, 2 Shidler J. L. Com. & Tech. 10 (2005).)  Plaintiffs allege that the program will enable Wal-Mart and Sam's Club to increase their domination of retailing and purchasing in the United States and make those companies "further untouchable" in the market for aftermarket auto parts.  (¶¶ 140A, 143.)  Again, plaintiffs contend that the program constitutes an unlawful form of price discrimination, prohibited by the Robinson-Patman Act.  (¶¶ 142, 147.)

In count IV, plaintiffs allege that the manufacturer defendants have provided an advertising and promotional program to the retailer defendants without making an equivalent program available to them.  The elements of the program are the elements of the vendor agreements that the parts manufacturers enter into with the retailer defendants.  They include: multi-year vendor agreements; display and endcap allowances; promotional allowances; fees and discounts; advertising allowances and discounts; "gathering allowances" paid by the manufacturers to AutoZone; warehouse and store changeover allowances; "slotting allowances" for making retail shelf space available; specials, markdowns, and guaranteed profit margins; guaranteed lowest price protection; deferred-payment arrangements of 157 months or more; allowances for the return of goods; payments for services not provided or in an amount in excess

of the cost of those services; honoring lifetime warranty programs of competing retailers; unjustifiably returning "cores" (non-working auto parts) to the manufacturer for refund or credit; and providing lengthy delays for payment to be made after delivery of goods.  (¶ 159.)  Plaintiffs allege, again on information and belief, that the cost of the advertising and promotional program amounts to 25% of the suggested retail price of each respective retailers' product line sales.[2]  (¶ 160.)

### B.    Procedural History

#### 1.   *Coalition 1*: Pretrial[3]

Coalition, joined by approximately 245 jobbers and WDs, initially filed suit against the retailer defendants in the Eastern District of New York on February 16, 2000.  (¶ 223; *see* Compl., *Coalition I*, No. 00 Civ. 953 (E.D.N.Y., filed Feb. 16, 2000).)  Plaintiffs' attorney in this action, Mr. Carl Person, also represented all 245 plaintiffs therein, and substantial portions of the complaint in that action are identical to the complaint here.  (*See* Appendix to Defs.' Mem., Aug. 10, 2005 (Docket No. 31).)  The *Coalition I* complaint, however, did not assert claims against the parts manufacturers (just purchasers/retailers); nor did it assert claims arising out of AutoZone's POS and Wal-Mart's RFID programs.  The district court denied a motion to dismiss, reasoning

---

[2] As amended, the complaint also includes nine appendices.  Appendix A lists plaintiffs who have gone out of business.  Appendix B-1 compares a sample of approximately 250 wholesale prices paid by various plaintiffs with retail prices contemporaneously charged by defendants for the same parts.  Appendix B-2 estimates the wholesale price paid by major auto parts retailers by deducting an assumed profit margin from the retailers' retail prices.  Appendix B-3 lists a sample of auto parts sales to jobber plaintiffs (by the defendant manufacturers and certain non-party WDs), plaintiffs' resale price, and plaintiffs' profit margin.  Appendix B-4 lists the years during which product lines of the defendant manufactures were being sold directly by the manufacturers to the major retailers.  Appendix B-5 lists the product lines that parts listed in other appendixes belong to.  Appendix B-6 lists representative auto-parts purchases by plaintiffs or plaintiffs' WD suppliers of manufacturers' product lines.  Appendix C lists additional competitive details about the plaintiffs and defendants, including the "M#1 – M#18" product lines carried by the plaintiffs during the limitations period.  Lastly, appendix D specifies which plaintiffs are suing which defendants.

[3] The Court takes judicial notice of proceedings in *Coalition I* to establish the fact of that litigation and the nature of the claims asserted therein.  *See Shuttlesworth v. City of Birmingham, Ala.*, 394 U.S. 147, 157 (1969).

under the standard of *Conley v. Gibson*, 355 U.S. 41 (1957), that it did not appear beyond doubt

that plaintiffs could not prove any set of facts that would entitle them to relief.  *See Coalition for*

*a Level Playing Field L.L.C. v. AutoZone, Inc.*, No. 00-CV-0953, 2001 WL 1763440, *2

(E.D.N.Y. Oct. 18, 2001) (Mishler, J.).

       During pretrial proceedings, the parties and the Court attempted on three occasions to

reduce the complexity of the litigation.  On May 16, 2002, the parties stipulated to the dismissal

of all but nineteen plaintiffs.  With respect to the dismissed plaintiffs, the stipulation drafted by

the parties and "so ordered" by the Court provided:

> 2.  Each of the plaintiffs in the 2nd Amended Complaint who or which is not in
> the caption above is hereby dismissed without prejudice, and without loss of any
> claim for relief asserted by any of them in the 2nd Amended Complaint, and
> without loss by any such plaintiff of any right to assert a claim for any damages
> which have resulted therefrom for such plaintiff from four years preceding the
> commencement of this action to the date this stipulation is so-ordered by the
> Court.

> 3.  After completion of any trial (or after any settlement) of the claims of the
> above-captioned plaintiffs has taken place, the remaining plaintiffs . . . have a
> period of six (6) months in which to reactivate their claims in the 2nd Amended
> Complaint, by the service and filing of a notice of reactivation of their claims . . .
> with proof of service.

Through its language disclaiming "loss of any claim for relief," the stipulation appears to have

contemplated that the judgment in *Coalition I* would have no preclusive effect as to the dismissed

plaintiffs.

       On November 25, 2002, the remaining plaintiffs in *Coalition I* voluntarily limited their

claims to twenty-five specific parts.  (Br. of Defendants-Appellees, *Coalition for a Level Playing*

*Field L.L.C. v. Autozone, Inc.*, No. 03-7225, 2003 WL 24132909, at 6 (2d Cir. Aug. 11, 2003)

("Defs.' Circuit Br."); *see also* Br. of Plaintiffs-Appellants, *Coalition for a Level Playing*

*Field L.L.C. v. Autozone, Inc.*, No. 03-7225, at 13-15 (July 9, 2003) ("Pls.' Circuit Br.").)  Then, on the

day before trial began, the court (Wexler, J.) issued a verbal order limiting evidence and

testimony to five specific parts sold by two retailers, AutoZone and Advance.  Apparently by agreement of the parties, the jury's verdict as to these parts was to determine the defendants' liability for all the parts at issue in *Coalition I*.  (Coalition I Tr. 146-47.)[4]

### 2. *Coalition I*: Trial

Trial commenced on January 22, 2003.  Plaintiffs presented live or deposition testimony from eleven witnesses, and expert testimony from an economist.  Defendants presented two fact witnesses and three expert witnesses.

The centerpiece of plaintiff's case was testimony by representatives of five WDs.  This testimony tended to show that the WDs competed with AutoZone and Advance, that AutoZone and Advance undercut their prices, and that the WDs' business suffered as a result.  For example, the president of Prevatte Auto Supply, Inc., a three-step WD located in Lumbarton, North Carolina, testified that before AutoZone and Advance opened stores in North Carolina, his company was "very healthy economically."   (Coalition I Tr. 52.)  After AutoZone and Advance appeared, however, Prevatte had to lower its profit margin on auto parts to approximately 22½%. (*Id.* at 71.)  This made it difficult to run a business; Prevatte was forced to terminate its insurance program, lay off employees, and take additional measures to control costs, such as installing a high-capacity fuel tank.  (*Id.*)

---

[4] The court stated its order on the record as follows:

> THE COURT: [L]et me advise you of something else which I should have done earlier. There are more than 22 plaintiffs and there are more than 25 items.  I limited [the trial] to the plaintiff calling only five plaintiffs or less and only talking about five items.
>
> So if you see only four or five plaintiffs testify, it's because I don't want to hear from all 22 plaintiffs and I don't want to hear about every part.  You take a representative proof and you can decide yes, no, or what the facts are based on a small sampling and I let the plaintiff pick out whoever he wants.
>
> So you understand, he's not calling all 22 plaintiffs to the stand and we won't hear about 25 particular items, right?
>
> MR. PERSON: Correct, your Honor.

On the question of pricing, the witness testified that one manufacturer, Fel-Pro, offered Prevatte "a menu of services and support that we could in effect give up and receive additional discounts." (*Id.* at 73.)  For instance, if Prevatte stopped using the services of a Fel-Pro field service representative, or agreed to limit its ability to return defective merchandise, it would receive an additional discount on parts it ordered.  (*Id.*)  "Overall, there were about five or six elements that increased the discount and by giving up other economic benefits that worked up to approximately 35 percent."  (*Id.* at 73-74.)  Prevatte took advantage of some of these functional discounts and passed the savings on to its jobber clients.  (*Id.* at 74.)  It declined to take advantage of other discounts and was not offered yet others.  (*Id.* at 74-80.)

The president of Irving Levine Automotive Distributors, Inc., a two-step WD headquartered in Danbury, Connecticut, testified that after his company began to compete with AutoZone and Advance, he had to change the mix of products he offered and enter into new markets to remain competitive.  (*Id.* at 148, 151.)  Irving competed directly with big box retailers by buying parts directly from manufacturers and selling them to end users.  (*Id.* at 149.)  To stay competitive, it periodically conducted market research ("shopping," in industry lingo) to determine its competitors' prices.  (*Id.* 152-53.)  Through such research, Irving learned that AutoZone was selling particular parts for prices that were "drastically reduced."  (*Id.* at 154.)  The witness concluded, based on an assumption that AutoZone earned a forty percent margin on parts sales, that AutoZone paid fifteen to twenty percent less for parts than his company did.  (*Id.* at 154-55.)

With respect to pricing, the witness testified that Irving received a number of discounts from parts manufacturers, in part because of its membership in a program buying group.  These included free goods to compensate Irving for putting products in a new store, promotional

allowances of one to two percent, a small defective merchandise allowance, a warehouse changeover allowance, and a store changeover allowance.  (*Id.* at 161-64.)  However, Irving never received an "end cap" allowance for advertising a manufacturer's products at the end of an isle, a freight allowance, a back haul allowance, or a new warehouse allowance.  (*Id.* at 161-62, 164.)  In addition, Irving was never promised a rebate if a parts manufacturer failed to timely perform its contractual obligations.  (*Id.* at 164.)  Altogether, Irving paid approximately 37 percent less than the blue sheet price for auto parts.  (*Id.* at 162.)

Plaintiffs' economist, Dr. Michael A. Einhorn, testified that there had been "tremendous amounts of growth" by chain stores in the auto parts industry over the past five years.  (*Id.* at 328.)  Chains had "congeal[ed]" their parts-buying in a single headquarters operation.  (*Id.* at 328.)  As a result, the chains possessed buying power, which they used to obtain lower prices and negotiate "buying arrangements"—arrangements that modified non-price terms of sale, such as payment terms and the extension of credit.[5]  (*Id.*)  The arrangements allowed the chains to finance their expansion without having to go to banks or the capital markets for financing.  (*See id.* at 328-29.)  Dr. Einhorn, however, did not opine as to whether the parts manufacturers had engaged in price discrimination.  (*Id.* at 330 ("I have no proof of price discrimination.").)

Representatives from a number of parts manufacturers testified as hostile witnesses during plaintiffs' case-in-chief.  Interestingly, these witnesses generally conceded that AutoZone and Advance paid lower wholesale prices for auto parts.  They maintained, however, that the lower prices were merely discounts compensating AutoZone and Advance for functions they performed, or were otherwise privileged under the Robinson-Patman Act.  For example, the general manager of Cardone Industries' under-hood business unit testified that "[a] customer

---

[5] "Buying power" refers to the ability of a firm that exercises market power to force sellers to reduce price below the level that would emerge in a competitive market.  *See, e.g.*, Roger G. Noll, *"Buyer Power" and Economic Policy*, 72 Antitrust L.J. 589, 589 (2005).

earns or is awarded a functional discount off of the blue sheet [price] depending on the functions [it] provides."  (*Id.* at 389-90.)  These discounts included marketing allowances, promotional allowances, and freight allowances.  (*Id.* at 391.)  The witness testified that retailers such as AutoZone and Advance provide a service by marketing and promoting Cardone's products in their stores, and thus save Cardone the expense of utilizing its own sales force or an external sales force to perform sales and marketing functions.  (*See id.* at 400.)  In addition, AutoZone and Advance "to some extent . . . provid[ed] their own transportation of product," which reduced Cardone's transportation and distribution costs.  (*Id.*)  A representative of Federal Mogul testified that different customers, including large retailers, program buying groups, and WDs "have different combinations of allowances and discounts and other things that they request."  (*See id.* at 487.)  Most significantly, AutoZone performed mass distribution to all forty-eight states, and did "a pretty good job of marketing or advertising the [Federal Mogul] brand name," for which it received a discount.  (*See id.* at 492-93.)  The witness testified that "[t]he buying groups [to which WDs belong] keep a lot of discounts that we give them at the headquarter level."  (*Id.* at 491.)  Thus, discounts did not "run through to the WDs['] cost structure."  (*Id.*)

Defendants' economist, Professor Kenneth G. Elzinga, echoed the view that the lower prices paid by AutoZone and Advance reflected compensation for services they performed for the parts manufacturers.  He opined, based on his interviews with industry executives, that parts manufacturers and retailers engage in hard bargaining over the price retailers pay for parts.  In the course of such a negotiation, both parties consider which "downstream services" the retailer can offer the manufacturer.  Dr. Elizinga elaborated that:

> It might be in the form of transportation savings.  It might be in the form of inventory and warehouse savings.  It might be in the form of promotional and merchandising savings that [the manufacturers] would otherwise have to pay for themselves.  They would have to hire the trucking company.  They would have to

> hire the warehouse.  They would have for, perhaps, put their own ads on the radio
> and other types of merchandising.

(*Id.* at 690.)  After coming to an agreement on the value of these services, which the

manufacturers view as a "bundle," the parties determine final price terms, which reflect the list

price of parts less functional discounts for services provided by the downstream retailer.  (*See id.*

at 690-91; *see also id.* at 695-96 ("[T]here may be six or seven discrete discounts that cannot

always be tied in some dollar for dollar, wooden and mechanical way to particular services.  Now

that's not surprising to me as an economist that a negotiation would go that way.").

   In response to questioning from plaintiffs' counsel, Dr. Elzinga explained that in his view,

there was little risk that the manufacturers would grant concessions for services that were not

actually performed, because none of the major auto-parts retailers possesses buying power in the

market for auto parts.  AutoZone, for example, only controls twelve percent of the domestic

market for auto parts.  (*Id.* at 691.)  Thus, it is not in a position to extract supracompetitive

discounts for the services it provides to manufacturers.  (*Id.* at 696.)  If it tried to do so, a

manufacturer simply would sell its parts through other retailers.  (*See id.* at 691.)  Plaintiffs

presented no evidence that AutoZone or Advance was a monsopony, or a part of an oligopsony

that controlled purchasing in the auto parts market.

   At the close of five days of testimony, the jury returned a verdict for defendants.  In two

separate verdict forms, it indicated that although plaintiffs had proven that manufacturers sold

products of like grade and quality to them and to the retailer defendants, plaintiffs had not proven

that the manufacturers had unlawfully charged different prices to different purchasers.  (*See*

Prager Decl. Ex. 3, Aug, 10, 2005.)  The court entered a judgment consistent with the verdict on

January 28, 2003.  (Prager Decl. Ex. 4.)

### 3. *Coalition I*: Appeal and Subsequent Proceedings

Plaintiffs appealed.  They argued: (i) that a discovery order requiring them to produce approximately 35,000 boxes of invoices in the Eastern District of New York was unlawful and abusive (Br. of Plaintiffs-Appellants, *Coalition for a Level Playing Field L.L.C. v. Autozone, Inc.*, No. 03-7225, at 24-26 (July 9, 2003)); (ii) that the court's verbal order limiting testimony and evidence to five parts violated due process (*id.* at 27-28); (iii) that the district court improperly excluded expert testimony of Wallace H. Kuralt, a bookstore owner who proposed to testify as an expert in retailing and chain management;  (*id.* at 32); and (iv) that the district court improperly excluded evidence of transactions that occurred after the filing date of the original complaint (*id.* at 33-34).  The Second Circuit, reviewing for fundamental error because plaintiffs failed to submit a proper appellate record, rejected all of plaintiffs' arguments and affirmed the district court's judgment.  *Coalition for Level Playing Field, L.L.C. v. Autozone, Inc.*, 82 F. App'x 240 (2d Cir. 2003).

On July 22, 2003, the plaintiffs who dismissed their claims pursuant to the May 16, 2002, stipulation filed a "Notice of Reactivation" in the Eastern District of New York.  On February 13, 2004, the court entered an order dismissing the reactivated plaintiffs' claims.  The order noted that the claims of the reactivated plaintiffs should be made pursuant to the filing of a new complaint, "subject to the terms and conditions of the Stipulation  . . . ."  (Order of Dismissal, Feb. 13, 2004 (Docket No. 276).)  The court therefore dismissed the case "without prejudice . . . to the 220 Plaintiffs identified as reactivating their claims in the July 22, 2003 Notice of Reactivation of Dismissed Plaintiffs and Claims, with any new complaint(s), wherever filed, to be subject to the terms and conditions of the 5/16/02 Stipulation."  (*Id.* at 1-2.)

14

### 4.  **This Action**

On October 27, 2004, Coalition, joined by the nineteen plaintiffs who went to trial in *Coalition I* and approximately half of the 220 plaintiffs who reactivated their claims, filed a complaint in this court.  As amended, the complaint includes the four counts described above, as well as claims arising out of defendants' alleged discovery misconduct during *Coalition I* (count V).  In count V, plaintiffs allege that defendants misrepresented to Judge Wexler, the trial judge in *Coalition I*, that they intended to review approximately 35,000 boxes of invoices that the court ordered produced within the Eastern District of New York.  (Compl. ¶ 224-25.)  Plaintiffs contend that as a result, they were forced to incur direct costs of $525,000, and to lose the *Coalition I* trial.  (¶ 233.)

Counting the motion now before the Court, defendants have moved to dismiss the complaint three times.  On August 10, 2005, defendants filed their first motion, arguing that plaintiffs had not alleged the elements of a prima face violation of the Robinson-Patman Act, that AutoZone's POS program and Wal-Mart's RFID program did not implicate the Robinson-Patman Act, that certain Sherman Act claims asserted in the original complaint were deficient, and that claims based on defendants' conduct during *Coalition I* were barred by res judicata.  (*See* Docket No. 34, 37.)  At the same time, defendants separately moved for an order dismissing the case under the doctrines of res judicata and collateral estoppel, and enjoining plaintiffs from continuing to engage in vexatious litigation (the "vexatious litigation" motion).  (*See* Docket No. 29, 31.)  Plaintiffs responded to defendants' first motion by filing an amended and supplemental complaint (Docket No. 47).

The Court approved the filing of the Amended and Supplemental Complaint (Docket No. 49), and defendants moved to dismiss the complaint for a second time.  In addition to reiterating

many of the arguments from their original motion, defendants argued that five new appendices attached to the Amended and Supplemental Complaint did nothing to overcome the original complaint's defects.  (Docket No. 54.)  Plaintiffs filed an opposition to the motion; they also filed a cross-motion to amend the complaint a third time by adding appendix B-6.  (Docket No. 60.)  The Court granted plaintiffs' cross-motion, mooting defendants' second motion to dismiss.  *See Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 260 (2d Cir. 2002) ("[A]n amended complaint ordinarily renders the original complaint of no legal effect.").  Defendants subsequently renewed their motion to dismiss.[6]  (Docket No. 79.)

For the reasons to follow, the Court grants in part defendants' motion to dismiss based on principles of res judicata and collateral estoppel and finds that certain aspects of certain plaintiffs' claims are precluded by *Coalition I*.  Those claims are dismissed with prejudice.  The Court also grants defendants' motion to dismiss and dismisses the remainder of plaintiffs' claims in their entirety.  However because the Court bases its ruling in part on two recent Supreme Court decisions, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), and because the supplemental amended complaint was filed prior to those decisions, the Court defers decision on whether to grant leave to amend and offers plaintiffs the opportunity to move to add curative amendments.

---

[6] The story does not quite end there.  While defendants' motions were pending, the Supreme Court decided *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).  In a letter submitted shortly thereafter, defendants argued that the decision required the Court to dismiss the complaint.  While the complaint assumes discriminatory pricing from the retail prices charged by the retailer defendants, those prices, defendants maintained, "are just as consistent (if not more consistent) with an inference of non-discriminatory pricing by the Manufacturer Defendants . . . ."  (Letter from Steven M. Edwards to Hon. Richard J. Holwell, at 2 (July 11, 2007).)  Plaintiffs' letter in response did not dispute this point.  Instead, it argued that *Twombly* does not apply to actions under the Robinson-Patman Act.  (Letter from Carl E. Person to Hon. Richard J. Holwell, at 1 (July 19, 2007).)

Around the same time, the Second Circuit decided *Iqbal v. Hasty*, 490 F.3d 143 (2d Cir. 2007).  Because the case decided an important questions of federal law that had not been settled by the Supreme Court, this Court anticipated that the Supreme Court would review the Second Circuit's decision.  That prediction proved true, *Ashcroft v. Iqbal*, 128 S. Ct. 2931, 171 L. Ed. 2d 863 (2009), and the Court deferred consideration of defendants' motions until after the Supreme Court decided *Iqbal*.

## II.   DISCUSSION

### A.  Preclusion Generally

Defendants contend that this action is precluded by the judgment in *Coalition I* under principles of res judicata (claim preclusion) and collateral estoppel (issue preclusion).  Under claim preclusion, final judgment forecloses "successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit."  *New Hampshire v. Maine*, 532 U.S. 742, 748, 121 S. Ct. 1808, 149 L.Ed.2d 968 (2001).  The scope of the claim extinguished by a first judgment "includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose."  Restatement Second of Judgments, 1981, § 24.  "What factual grouping constitutes a 'transaction,' and what groupings constitute a 'series,' are to be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage."  *Id.* Issue preclusion, on the other hand, "bars successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, even if the issue recurs in the context of a different claim."  *Taylor v. Sturgell*, 553 U.S. 880, 128 S. Ct. 2161, 2171, 171 L.Ed.2d 155 (2008).

There are powerful reasons underlying the preclusion doctrines, reasons that are particularly implicated here.  Claim preclusion and issue preclusion "protect against the expense and vexation attending multiple lawsuits."  *Id.  Coalition I* was an enormously expensive and vexatious process for both parties (*see* count V of this complaint, through which plaintiffs

attempt to recoup discovery costs), and based on the voluminous submissions to date, this action has already cost the parties more than most litigations do through conclusion.  Furthermore the preclusion doctrines "conserve judicial resources."  *Id.*  Finally, the preclusion doctrines "foster reliance on judicial action by minimizing the possibility of inconsistent decisions."  *Id.* (quoting *Montana v. United States*, 440 U.S. 147, 153-154, 99 S. Ct. 970, 59 L.Ed.2d 210 (1979).  Defendants in *Coalition I* who learned through that judgment that their sales activities were legal, and who may have relied thereon, would be whipsawed by a subsequent contrary judgment here.

However important the policies of preclusion, the preclusive effect of *Coalition I* is limited in two crucial respects.  First, it is limited to sales during the time periods covered by *Coalition I*, since the claims in the complaint allege continuing discriminatory pricing practices, and in an antitrust context, the "[f]ailure to gain relief for one period of time does not mean that the plaintiffs will necessarily fail for a different period of time."  *Harkins Amusement Enterprises, Inc. v. Harry Nace Co.*, 890 F.2d 181, 183 (9th Cir. 1989) (citing *Lawlor v. National Screen Service Co.*, 349 U.S. 322, 329, 75 S.Ct. 865, 869, 99 L.Ed. 1122 (1955)) (reasoning that allowing preclusion would afford successful antitrust defendants "immunity in perpetuity" from the antitrust laws); *International Technologies Consultants, Inc. v. Pilkington PLC*, 137 F.3d 1382 (9th Cir. 1998).  Second, the preclusive effect of *Coalition I* is limited to sales involving the defendants and plaintiffs who saw it through to judgment, since "one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process."  *Hansberry v. Lee*, 311 U.S. 32, 40, 61 S.Ct. 115, 85 L.Ed. 22 (1940) (quoted in *Taylor*, 128 S. Ct. at 2166-2167 (also noting several exceptions inapplicable here). [7]

---

[7] One exception to this general rule applies to preclude a nonparty that has become a litigation agent for a party to the earlier case.  *Taylor*, 128 S. Ct. at 2179.  This rule is implicated if "the putative agent's conduct of the suit is

Accordingly, only the claims brought by *Coalition I* judgment plaintiffs against *Coalition I* judgment defendants are precluded thereby, and even then only to the extent that they allege violations overlapping in time with those in *Coalition I*. Those aspects of the complaint are dismissed with prejudice.

**B. Count V**

The Court turns next to certain plaintiffs' claims arising out of defendants' alleged misrepresentations to Judge Wexler during *Coalition I*. Defendants contend that these claims are an impermissible attempt to relitigate issues that were decided in *Coalition I*; that their statements to the court are privileged under the *Noerr-Pennington* doctrine; that plaintiffs' have failed to state a claim for fraud; and that the other causes of action alleged in count V are frivolous on their face. (Defs.' Mem. 49-58.) Plaintiffs respond that because defendants' representations to Judge Wexler were objectively baseless, they are unprotected by *Noerr-Pennington*. (Pls.' Mem. 38-39.) Plaintiffs say that they need discovery in *this* action to discover what happened during *Coalition I*. (Pl.'s Mem. 37.)

The Court agrees with defendants that principles of claim preclusion bar a collateral damages action based on defendants' alleged discovery misconduct in *Coalition I*. There is no dispute that the district court entered a final judgment in *Coalition I*, or that the claims in count V are brought by plaintiffs who were parties to that action against defendants who were also parties to that action. Plaintiffs contend that the count V claims could not have been asserted in the prior action, because they "never had an opportunity to obtain evidence of the fraud through

---

subject to the control of the party who is bound by the prior adjudication." *Id.* Thus defendants argue that the *Coalition I* plaintiffs who withdrew prior to trial were in privity with the judgment plaintiffs therein and should be subjected to preclusion in this action. While all of the plaintiffs in both this action and *Coalition I* may be controlled by the Coalition and by plaintiff's attorney, on the present record the Court lacks sufficient evidentiary basis to make that conclusion. "[I]t is incumbent on the defendant to plead and prove such a defense." *Id.* (noting the availability of targeted interrogatories and deposition questions to acquire the requisite proof).

discovery," and they "could not have won" a motion for discovery sanctions, presumably because Judge Wexler would not be inclined to reconsider the propriety of his rulings.  (Pls.' Second Mem. 40.)  Yet neither contention responds to the crucial point—that claims seeking money for defendants' discovery misconduct are intertwined with the claims litigated in *Coalition I* and easily could have been brought as part of that action via Rules 37 or 60.  *See Waldman v. Village of Kiryas Joel*, 207 F.3d 105, 108 (2d Cir. 2000) (in determining whether second suit arises from same "transaction" or "claim" as first action, court must consider whether underlying facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations); *see also Bettis v. Kelly*, No. 02 Civ. 104 (MBM), 2004 WL 1774252, at \*2 (S.D.N.Y. Aug. 9, 2004) (freestanding claim for discovery misconduct barred by res judicata absent Rule 60 relief), *aff'd*, 137 F. App'x. 381 (2d Cir. 2005).  In essence, plaintiffs are seeking collateral review of Judge Wexler's discovery orders through a freestanding action for fraud.  But if courts allowed such actions, the already complex process of federal antitrust discovery would metamorphasize into Jorge Luis Borges' *Libro de Arena*—a story without an end.

There is a second reason why the claims in count V fail: They are brought in the wrong court.  In *Cresswell v. Sullivan & Cromwell*, 922 F.2d 60 (2d Cir. 1990), the Second Circuit held that absent an independent basis for subject matter jurisdiction, Rule 60 provides the exclusive means for a federal court to entertain a collateral damages action arising out of a litigant's fraud or misconduct in an action that has proceeded to judgment.  *Id.* at 70-71.  A Rule 60 motion, however, generally must be addressed to the court that issued the challenged judgment, 12 Joseph T. McLaughlin et al., *Moore's Federal Practice* § 60.60[1], at 60-190 to 60-191 (2005) (citing, inter alia, *United States ex rel. Aigner v. Shaughnessy*, 175 F.2d 211 (2d Cir. 1949)); and

plaintiffs have not offered any justification for bringing the claims in count V here instead of the Eastern District of New York.

## C.  Failure to State a Claim

Regardless of the preclusive effects of *Coalition I*, the complaint fails to state a claim upon which relief can be granted.  Count I, alleging anticompetitive price discrimination under the Robinson-Patman Act, fails to plausibly allege: (i) that disparate prices charged by defendants reflect anticompetitive price discrimination rather than permissible functional discounts; (ii) that those prices are not the product of materially different contractual arrangements; or (iii) that certain alleged discount arrangements are not merely non-price terms of sale (which do not implicate the Act).  Count II, alleging Robinson-Patman violations based on Autozone's Pay-on-Scan program, and count III, alleging violations based on Wal-Mart's RFID program, fail to allege price discrimination because both programs are non-price terms of sale.  And count IV, alleging discriminatory provision of promotional and advertising allowances, fails to adequately allege discrimination and resulting injury in advertising and promotional programs with respect to individual plaintiff retailers.  The Court will first address the substantive law of the Robinson-Patman Act and the applicable pleading standards before turning to the inadequacies in each count of the complaint.

### 1.  The Robinson-Patman Act

Congress enacted the Robinson-Patman Act in 1936 because of its concern that large chain stores were exercising economic power to obtain anticompetitive discounts on large purchases of goods.  *Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc.*, 546 U.S. 164, 175 (2006); *see* 14 Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 2302, at 8-12 (1999); Yale Brozen, *Foreword, in* Richard Posner, *The Robinson-*

*Patman Act: Federal Regulation of Price Differences*, at 1 (1976).  The Act responds to this harm to competition by, among other things, prohibiting sellers from granting favored buyers unequal prices or access to promotional programs.  However with the RPA "Congress did not intend to outlaw price differences that result from or further the forces of competition."  *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 220 (1993).  Thus the Supreme has instructed that fairness goals notwithstanding, the Act must be construed consistently with the Nation's other, pro-competitive antitrust laws.  *E.g.*, *Id.* ("the Robinson-Patman Act should be construed consistently with broader policies of the antitrust laws"); *Great Atl. & Pacific Tea Co. v. FTC*, 440 U.S. 69, 80-81 & n. 13 (1979); *Automatic Canteen Co. v. FTC*, 346 U.S. 61, 63 (1953).

The heart of the Robinson-Patman Act is § 2(a).  This section generally prohibits a seller of commodities in interstate commerce from giving some of its buyers lower prices than others.  In relevant part, it provides that:

> It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, . . . where the effect of such discrimination may be substantially . . . to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them . . . .

15 U.S.C. § 13(a).

In order to establish a violation of the Act, plaintiff has the burden of proving that: (i) a "commodity" was sold in interstate commerce to at least two buyers; (ii) the commodity sold to the disfavored purchaser was of "like grade and quality" to that sold to the favored purchaser; (iii) the seller "discrimate[d] in price between" the favored and disfavored purchaser; and (iv)

that discrimination had a prohibited effect on competition.[8] 15 U.S.C. § 13(a); *See Texaco v. Hasbrouck*, 496 U.S. 543, 556 (1990); *George Haug Co., Inc. v. Rolls Royce Motor Cars Inc.*, 148 F.3d 136, 141 (2d Cir. 1998).

Despite its seemingly broad coverage, it would be a mistake to assume that § 2(a) regulates all transactions that somehow involve a price differential. *See Volvo*, 546 U.S. at 180 (noting that Robinson-Patman signals no large departure from the "main concern" of antitrust law, interbrand competition); *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 220 (1993) ("Congress did not intend to outlaw price differences that result from or further the forces of competition."); *Anheuser-Busch, Inc.*, 363 U.S. at 553 ("[P]rice differentials constitute but one element of a § 2(a) violation."). Just the contrary, courts have held that in at least three circumstances relevant to this action, a seller may charge different prices to different buyers without violating § 2(a).

First, courts have held that a seller may charge a buyer reduced prices if the reduced prices reflect a bona fide "functional discount"—in essence, a set-off for the value of services the purchaser performs for the seller. In the leading case, Texaco supplied gasoline to independently-owned Texaco gas stations, as well as two gasoline distributors, Gull Oil Co. and Dompier Oil Co. *See Texaco Inc. v. Hasbrouck*, 496 U.S. 543, 548-49 (1990). Texaco delivered gasoline to the independent stations and charged them "retail tank wagon" prices. *Id.* at 546-48.

---

[8] Courts have recognized three general categories of competitive injury that may give rise to a claim under the Act: primary line, secondary line, and tertiary line. "Primary line" cases involve conduct that injures competition between the seller and its direct competitors. "Secondary line" cases involve price discrimination that injures competition between the discriminating seller's customers. In the terminology of these cases, the seller charges "favored" purchasers lower prices and "disfavored" purchasers higher prices. "Tertiary line" cases involve injury to competition at the level of the purchaser's customers. *See Volvo*, 546 U.S. at 176. This case has elements of both a secondary and tertiary-line case. To the extent the retailer defendants compete with two-step retailer WDs, plaintiffs assert traditional secondary-line claims; the retailer defendants and two-step WDs compete for customers at the secondary line of competition. To the extent the retailer defendants compete with jobbers, plaintiffs assert hybrid secondary/tertiary-line claims; the retailer defendants, who operate at the second level of distribution, compete with jobbers, who operate at the third level.

However, it allowed Gull and Dompier to pick up gasoline from Texaco's bulk storage facility using their own trucks and granted them a discount for doing so.  *Id.* at 549.  Gull resold the gasoline under its own brand name, either on consignment or using stations where it owned the gasoline until it was resold to a customer.  *Id.*  Dompier started out as a distributor, but later entered the retail market with Texaco's encouragement.  *Id.* at 549-50.  The independent Texaco stations sought to purchase gasoline directly from Texaco, but Texaco rebuffed their efforts.  *Id.* at 548.  Thereafter, seven independent stations went out of business, and a substantial amount of business shifted to stations controlled by Gull and Dompier.  *Id.* at 548.

The independent stations sued Texaco under Robinson-Patman.  After a jury returned a verdict for plaintiffs, Texaco moved for judgment notwithstanding the verdict, arguing that as a matter of law, a functional discount cannot cause injury to competition under § 2(a).  The district court denied the motion and the Ninth Circuit Court of Appeals affirmed.  *See Hasbrouck*, 496 U.S. at 553-54.

The Supreme Court agreed with the premise of the district court's analysis—that where a price differential merely accords due recognition and reimbursement for functions actually performed by a downstream buyer, it "is not illegal."  *Id.* at 562.  The Court reasoned that "[a] legitimate functional discount will not cause any substantial lessening of competition."  *Id.* at 561 & n.18.  Consequently, a plaintiff must show that a claimed functional discount is not genuine to carry its burden of showing potential harm to competition.  *Id.*  ("[T]he burden of proof remains with the enforcement agency or plaintiff in circumstances involving functional discounts since functional pricing negates the probability of competitive injury, an element of a prima facie case of violation." (quoting James F. Rill, *Availability and Functional Discounts Justifying Discriminatory Pricing*, 53 Antitrust L.J. 929, 935 (1985) (footnotes omitted))).  In the

"extraordinary" case before the Court in *Hasbrouck*, however, "there was no substantial evidence indicating that the discounts to Gull and Dompier constituted a reasonable reimbursement for the value to Texaco of their actual marketing functions." *Id.* at 562.  Dompier was separately compensated for hauling gasoline to its stations (precluding it from claiming a discount for hauling services), and neither Gull nor Dompier maintained any significant storage facilities (precluding either firm from claiming an additional discount for warehousing or inventorying gasoline).  *See id.* at 562.  Expressing agreement with the view that "the law should tolerate no subterfuge," *id.* at 560, the Court found that plaintiffs had carried their burden of showing potential harm to competition.  *Id.* at 572.

In ruling that functional discounts are "presumptively allowable," *id.* at 568, the Court clarified two aspects of the law that were previously unsettled.  First, pre-*Hasbrouk* decisions differed over whether the value of a functional discount was limited to the cost-savings to the seller, or whether a seller could set the amount of a discount using other measures.  *See Boise Cascade Corp. v. FTC*, 837 F.2d 1127, 1140-43 (D.C. Cir. 1988) (summarizing pre-*Hasbrouk* views).  *Hasbrouck* confirmed that a functional discount may be established using any commercially reasonable measure.  While concluding that Texaco's discounts did not pass muster, the Court specifically noted that "[a] supplier need *not* satisfy the rigorous requirements of the cost justification defense in order to prove that a particular functional discount is reasonable and accordingly did not cause any substantial lessening of competition between a wholesaler's customers and the supplier's direct customers."  *Hasbrouck*, 496 U.S. at 561 (emphasis added).  The Court further rejected the "requirement of exactitude" originating in *In re Doubleday & Co.*, 52 F.T.C. 169 (1955), that "a functional discount offered to a buyer 'should not exceed the cost of that part of the function he actually performs on that part of the goods for

which he performs it.'"   *Id.* at 565 n.21.  Thus, a functional discount is only illegal if (i) "the

discount is being given for services that are not being performed at all," or (ii) "the amount of the

discount greatly exceeds the value or cost of the service."  14 Hovenkamp, *supra*, ¶ 2333, at 108.

*Hasbrouck* also suggests, contrary to some earlier authority, that there is no per se rule

that bars a seller from granting a functional discount to a vertically-integrated buyer.  As another

district court has noted, the *Hasbrouck* Court never questioned the assumption, relied on by the

courts below, that a seller may grant a vertically-integrated retailer functional discounts.  *Am.*

*Booksellers Ass'n, Inc. v. Barnes & Noble, Inc.*, 135 F. Supp. 2d 1031, 1059 (N.D. Cal. 2001)

(citing *Hasbrouck v. Texaco, Inc.*, 842 F.2d 1034 (9th Cir. 1987), and *Hasbrouck v. Texaco, Inc.*,

634 F. Supp. 34, 37 n.4 (E.D. Wash. 1985)).  And throughout the *Hasbrouk* opinion, there is

language suggesting that functional discounts "are available even to vertically integrated retailers

. . . ."  *Am. Booksellers Ass'n*, 135 F. Supp. 2d at 1060.  *See also Boise Cascade*, 837 F.2d at

1132 ("The pure functional discount operates independently of the purchaser's level of trade.  . . .

[A]ny purchaser that performs the required functions would be eligible for the discount regardless

of whether it is nominally a wholesaler or retailer."); *but see Hasbrouk*, 496 U.S. at 565-66

(cautioning that "[m]anufacturers will more likely be able to effectuate [illegal] tertiary line price

discrimination through functional discounts to a secondary line buyer when the favored

distributor is vertically integrated").

Second, courts have held that a seller is not obligated to charge the same prices for a

commodity if its sales contracts with different buyers contain materially different terms.  Thus,

courts have long held that a seller may charge different prices for goods sold under long-term

contracts than for those sold on the spot market.  *See, e.g.*, *Coastal Fuels of Puerto Rico, Inc. v.*

*Caribbean Petroleum Corp.*, 990 F.2d 25, 27 (1st Cir. 1993) (Breyer, J.); *A.A. Poultry Farms,*

*Inc. v. Rose Acre Farms, Inc.*, 881 F.2d 1396, 1407 (7th Cir. 1989); *Texas Gulf Sulphur Co. v. J.*

*R. Simplot Co.*, 418 F.2d 793, 805-06 (9th Cir. 1969).  Because long-term sales contracts allow

both buyer and seller to reduce their exposure to changes in the market price of a commodity,

goods sold under a long-term contract are not "of like grade or quality" to those sold on the spot

market, even though the underlying goods are physically identical.  *See* IVX Hovenkamp ¶

2313d, at 33.  Similarly, the Seventh Circuit has held that eggs sold under a contract requiring

delivery at a fixed time are not "of like grade and quality" to eggs delivered at a time of the

seller's choosing.  *A.A. Poultry*, 881 F.2d at 1407-08.  Although the eggs delivered under both

contracts were physically identical, they fundamentally were not the same good, "for the same

reason a seat on the 6:00 a.m. flight from Chicago to New York is not the same as a seat on the

5:00 p.m. flight, and a seat on the 5:00 p.m. flight reserved two weeks in advance is not the same

as a seat on that flight for which the passenger had to stand by."  *Id.* at 1408.

    Beyond functional discounts and contracts containing materially different sales terms, §

2(a) does not apply to terms and conditions of sale other than price, unless they "operate[] to

permit the favored customers to purchase at a lower price than other customers, so that their only

practical effect [is] to establish discriminations in price . . . ."  *Corn Prods. Refining Co. v. FTC*,

324 U.S. 726, 740 (1945).  For example, in *Black Gold, Ltd. v. Rockwool Industries, Inc.*, 729

F.2d 676 (10th Cir. 1984), the Tenth Circuit rejected the argument that a supplier's failure to

make timely deliveries to a disfavored customer violated § 2(a), even though the late deliveries

caused the purchaser to lose profits.  The court explained that although many non-price terms

have the capacity to affect a distributor's or a retailer's profitability, "Section 2(a) is directed to

price discrimination and nothing more."  *Id.* at 682.  By contrast, the Supreme Court held in *Corn*

*Products* that a glucose seller violated § 2(a) by permitting favored customers to secure options

for the purchase of glucose, and to take delivery at a lower price for periods longer than those usually permitted to other customers. *See Corn Products*, 324 U.S. at 740. Though the discriminatory contract term nominally related to time of delivery, its only "practical effect" was to change the price charged to favored sellers. *Id.*

Sections 2(d) and 2(e) of the Act address two non-price indirect forms of price discrimination that sometimes injure small buyers. Section 2(d) "makes it unlawful for a supplier in interstate commerce to grant advertising or other sales promotional allowances to one 'customer' who resells the supplier's 'products or commodities' unless the allowances are 'available on proportionally equal terms to all other customers competing in the distribution of such products or commodities.'" *FTC v. Fred Meyer, Inc.*, 390 U.S. 341, 343 (1968).[9]  Section 2(e) prohibits a seller from directly subsidizing services or facilities for an intermediary purchaser, unless equivalent services or facilities are made available to competing purchasers.[10] *See George Haug*, 148 F.3d at 144 ("Section 2(d) and Section 2(e) differ in that in the former, the purchaser supplies the services or facilities and the supplier repays the purchaser; in the latter, the

---

[9] Section 2(d) provides in full:

> It shall be unlawful for any person engaged in commerce to pay or contact for the payment of anything of value to or for the benefit of a customer of such person in the course of such commerce as compensation or in consideration for any services or facilities furnished by or through such customer in connection with the processing, handling, sale, or offering for sale of any products or commodities manufactured, sold, or offered for sale by such person, unless such payment or consideration is available on proportionally equal terms to all other customers competing in the distribution of such products or commodities.

15 U.S.C. § 13(d).

[10] Section 2(e) provides in full:

> It shall be unlawful for any person to discriminate in favor of one purchaser against another purchaser or purchasers of a commodity bought for resale, with or without processing, by contracting to furnish or furnishing, or by contributing to the furnishing of, any services or facilities connected with the processing, handling, sale, or offering for sale of such commodity so purchased upon terms not accorded to all purchasers on proportionally equal terms.

15 U.S.C. § 13(e).

seller supplies the services and facilities for use of the customer in facilitating resales."); *see also* XIV Hovenkamp ¶ 2363a, at 240.

To prevail on a claim under §§ 2(d) or 2(e), a plaintiff must prove that: (i) the seller paid or contracted to make some payment or allowance for the furnishing of advertising, promotional, or merchandising services in connection with a competitor's resale of the seller's products; (ii) the seller failed to offer the payments or allowances on proportionally equal terms to all other customers competing with the favored purchaser in the distribution of the seller's products; and (iii) the plaintiff was injured in its business or property because of the payment or allowance.  15 U.S.C. §§ 13(d), (e); *see Cecil Corley Motor Co., Inc. v. General Motors Corp.*, 380 F. Supp. 819, 852 (M.D. Tenn. 1974).

As with § 2(a), §§ 2(d) and 2(e) do not "provide relief against every form of unfair or inequitable treatment of customers."  *Id.* at 850; *see Monsieur Touton Selection v. Future Brands, LLC*, No. 06 Civ. 1124(SAS), 2006 WL 2192790, at *4 (S.D.N.Y. Aug. 1, 2006); XIV Hovenkamp ¶ 2363, at 239-63.  In particular, courts have held that because the statute is directed at the "resale" of commodities, only advertising, promotional, and merchandising services are regulated by §§ 2(d) and (e).  *See, e.g.*, *Hinkleman v. Shell Oil Co.*, 962 F.2d 372, 379 (4th Cir. 1992); *Am. Booksellers Ass'n v. Houghton Mifflin Co., Inc.*, No 94 CIV. 8566 (JFK), 1995 WL 92270, at *6 (S.D.N.Y. Mar. 3, 1995); *Ben B. Schwartz & Sons, Inc. v. Sunkist Growers, Inc.*, 203 F. Supp. 92, 100 (E.D. Mich. 1962).  *See generally* XIV Hovenkamp ¶ 2363e, at 249-56.

### 2.  Pleading Standard

"Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'"  *Bell Atlantic Corp. v. Twombly*, 550

U.S. 544, 554, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929 (2007) (quoting Fed. R. Civ. P. 8(a)(2);

*Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (abrogated in part by

*Twombly*)).  In *Twombly*, the Supreme Court held that to satisfy this standard, a complaint must

contain "enough facts to state a claim to relief that is plausible on its face."  *Id.* at 570; *See Starr*

*v. Sony BMG Music Entertainment*, 592 F.3d 314, 321 (2d Cir. 2010) (quoting *Twombly*).

The key defect in the *Twombly* complaint was that the complaint did not contain any

allegations from which it could be inferred that the defendants' conduct was illegal.  While § 1 of

the Sherman Act conditions liability on "an agreement, tacit or express," *Twombly*, 550 U.S. at

544, the conduct alleged in the complaint (failure to compete in a geographic market traditionally

controlled by a competitor) was "consistent with conspiracy, but just as much in line with a wide

swath of rational and competitive business strategy unilaterally prompted by common

perceptions of the market."  *Id.* at 554.  Hence, the Court observed that "when allegations of

parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that

raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well

be independent action," *id.* at 557; that "if alleging parallel decisions to resist competition were

enough to imply an antitrust conspiracy, pleading a § 1 violation against almost any group of

competing businesses would be a sure thing," *id.* at 566; and that "when the allegations in a

complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency

should be exposed at the point of minimum expenditure of time and money by the parties and the

court."  *Id.* at 558 (alterations and internal quotation marks omitted) (quoting 5 Charles Alan

Wright et al., *Federal Practice and Procedure* § 1216, at 233-34 (3d ed. 2004)).  The Court

concluded, in light of this shortcoming, that the substantial cost of antitrust discovery was

unwarranted.

In *Ashcroft v. Iqbal*, 556 U.S. ___, 129 S.Ct. 1937, 1949-50, 173 L.Ed.2d 868 (May 18, 2009), the Court clarified three aspects of the analysis mandated by *Twombly*.  First, the Court reiterated that courts may not presume illegality when the "nub" of a complaint, *id.* at 1950, alleges conduct that is equally capable of being legal:  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'"  *Id.* at 1949 (quoting *Twombly*, 550 U.S. at 557).  Second, the Court held that only well-pled factual allegations are entitled to a presumption of truth; "recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.* at 1949.  *Cf. id.* at 1960 (Souter, J., dissenting) (arguing that conclusory statements should not be disregarded if rendered plausible by the context in which they appear).  Third, the Court held that *Twombly*'s "plausibility standard" was not limited to antitrust cases or those requiring complex discovery.  While "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task," *Iqbal*, 129 S.Ct. at 1950, *Twombly* interpreted Rule 8 and therefore applies to "all civil actions."  *Id.* at 1953 (quoting Fed. R. Civ. P. 1).  Under this understanding of Rule 8, a complaint alleging that the former Attorney General and the former Director of the Federal Bureau of Investigation engaged in purposeful discrimination did not state a claim, even though the complaint alleged that they had "willfully and maliciously agreed to subject" the plaintiff to harsh conditions of a confinement "as a matter of policy, solely on account of [his] religion, race, and/or national origin and for no legitimate penological interest." *Iqbal*, 129 S.Ct. at 1944.

Read together, *Twombly* and *Iqbal* suggest that the Court keep in mind two requirements when adjudicating a motion to dismiss that challenges the sufficiency of a complaint's factual allegations.  First, although the Court must still accept factual allegations as true, it should not

credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action." *Iqbal*, 129 S.Ct. at 1949.  Second, accepting creditable allegations as true, the Court must also determine whether they plausibly suggest an entitlement to relief.  *See Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (adopting this reading of Iqbal).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 129 S.Ct. at 1949.  If the factual averments permit no reasonable inference stronger than the "mere possibility of misconduct," the complaint should be dismissed.  *Starr*, 592 F.3d at 321 (quoting *Iqbal*, 129 S.Ct. at 1950).[11]

### 3.  The Complaint Fails to State a Claim

Reading *Twombly* together with the requirements of the Robinson-Patman Act § 2(a), then, a Robinson-Patman plaintiff must plead facts supporting a plausible inference of unlawful price discrimination.  When functional discounts are at issue, *Texaco v. Hasbrouck* makes clear that such pleading includes facts rendering plausible the inference that a given discount is not a legitimate functional discount—that it is not substantially related to functions performed.  And when complicated contracts such as the vendor agreements between defendants are alleged, such pleading must refute the inference that parts are not sold subject to materially different contract terms or, separately, that differentials simply reflect non-price terms of sale; both of which are lawful under the Act.  With respect to count I, plaintiffs have failed to so plead in each of these respects.

The "nub" of the complaint in this action is the very theory plaintiffs advanced in *Coalition I*—that the retailer defendants take a number of discounts pursuant to their vendor agreements with the parts manufacturers, and that these discounts in fact are a subterfuge for

---

[11] For further detailed discussion of the pleading landscape post *Twombly*, *see* Noll, The Indeterminacy of Iqbal, 99 Geo. L.J. (forthcoming 2010)

illegal price discrimination.  (*See* Compl. ¶¶ 90; 94-106.)  In support of this theory, the complaint

cites a large amount of pricing data, including, in Appendix B-1, examples of parts where the

retailer defendants' retail prices are lower than plaintiffs' wholesale prices.  But while the

complaint plausibly alleges differentials, it contains virtually no allegations as to whether those

differentials are justified.  On this critical issue, the complaint offers little more than rote

allegations of illegality, such as those in ¶ 106(K)(7), which alleges, "Defendant Retailers are

aware that they are not 'efficient' in comparison to the Plaintiffs and that the only thing that

keeps the Defendant Retailer in business is buying goods at illegally low prices that do not have

any legitimate cost-justification, meeting-competition or functional discount defense . . . ."

Plaintiffs have offered no factual material to support a plausible inference that any

discounts taken by the retailer defendants do not reflect bona fide functional discounts.  It is

common ground that compared to WDs and jobbers, the retailer defendants pay lower wholesale

prices, operate in a different distribution chain, and provide a different mix of distribution,

warehousing, marketing, and promotional services to the parts manufacturers.  A plausible

inference to draw from these differences is that manufacturers and buyers engage in hard

negotiation over all aspects of their commercial relationship, and the retailer defendants offer the

manufacturers a mix of services that is more valuable than that offered by traditional WDs and

jobbers.

Against this backdrop, the complaint asks the Court to infer *illegal* price discrimination

from the mere fact that there are differences in the prices charged to the retailer defendants, WDs,

and jobbers.  While this analytic move (in essence, an assumption that primary behavior that

*could* be illegal *is*) was permissible and even encouraged under *Conley v. Gibson*, it is precisely

the inference that *Twombly* and *Iqbal* caution against drawing in the absence of factual

allegations demonstrating a plausible entitlement to relief.  Indeed the parallels between *Twombly* and this action are striking.  In *Twombly*, the complaint alleged conduct (parallel decisions not to compete in competitors' territory) that became illegal only if defendants entered into an agreement in restraint of trade.  *See Twombly*, 550 U.S. at 556-57.  Similarly, the complaint here alleges conduct (price differentials) that is "presumptively allowable," *Hasbrouck*, 496 U.S. at 568, which becomes illegal only if (i) discounts are given for services that are not being performed at all, or (ii) the amount of discounts greatly exceeds the value of the services provided by the retailer defendants.  There are no factual allegations, however, tending to show that either of these conditions is satisfied.  *Twombly* teaches that in these circumstances, "a district court . . . retain[s] the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed."  *Twombly*, 550 U.S. at 558 (quoting *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 528 n.17 (1983)).

A similar analysis applies under the rule that Robinson-Patman does not prohibit price differences that reflect materially different contract terms.  The complaint suggests that the supply agreements entered into by WDs, jobbers, and the retailer defendants contain materially different terms concerning matters such as delivery, warehousing, promotional services, and credit.  The complaint, however, ignores the possibility that these contract differences account for the lower prices paid by the retailer defendants, save for conclusory allegations that different provisions in the supply agreements entered into by WDs, jobbers, and the retailer defendants are *really* disguised price terms.  Absent a more particularized factual basis for drawing this broad-ranging legal conclusion, the allegations in the complaint are insufficient to state a § 2(a) claim.

Finally, a number of the contract provisions challenged in the complaint relate to non-price terms of sale.  Paragraph 90(G), for example, alleges that the retailer defendants' vendor agreements "permit[] deferred payments on goods sold to defendants . . . ."  To be sure, this paragraph goes on to allege that that deferred payments are "beyond and unrelated to credit terms awarded on the basis of defendants' or any other purchasers' credit rating, which amounts to the placement of interest-free capital with defendants by the manufacturers."  But under *Twombly* and *Iqbal*, this allegation, which simply attempts to paraphrase the relevant legal test, is not enough.  In view of the general rule that non-price terms are not regulated by § 2(a), *Corn Prods.* 324 U.S. at 740, a more specific statement is necessary to support a plausible inference that non-price discrimination is, in fact, price discrimination.

The claims in counts II and III suffer from similar flaws.  The AutoZone defendants contend that count II, relating to AutoZone's POS program, fails to state a claim, because: (i) the complaint does not allege that products or commodities sold through the program are sold to AutoZone at discriminatory low prices; (ii) POS transactions are not "reasonably comparable" to non-POS prices; (iii) product distribution through the POS program does not involve "sales transactions" covered by Robinson-Patman; (iv) the complaint neglects to allege that plaintiffs requested and were denied access to POS pricing; and (v) the program does not implicate §§ 2(d) or (e) of the Act.  (Defs.' Mem. 29-41.)  Plaintiffs dispute most of these points.  (*See* Pl.'s Mem. 26-30.)  More generally, they argue that any restructuring of a manufacturer's distribution chain that results in the AutoZone paying lower wholesale parts prices raises sufficient questions under the Robinson-Patman Act to warrant discovery.  For instance, plaintiffs contend that "POS is no more than a manufacturer supplying capital to AutoZone, to enable AutoZone to have reduced per-unit costs and take away more of the market from independents (plaintiffs) who pay higher

per-unit costs . . . ."  (Pl.'s Mem. 27.)  And, "[e]ven the costs imposed on manufacturers to reinvent their business to conform to the requirements of AutoZone are discriminatory payments for the benefit of AutoZone not made available by discount or promotional program to AutoZone's independent competitors, including the plaintiffs."  (*Id.* at 28.)

Of course, this is not the law.  *Volvo*, 546 U.S. at 181 n.4 ("Robinson-Patman does not bar a manufacturer from restructuring its distribution networks to improve the efficiency of its operations."); *Automatic Canteen*, 346 U.S. at 72 n.11 ("Time and again there was recognition in Congress of a freedom to adopt and pass on to buyers the benefits of more economical processes . . . .").  In particular, § 2(a) does not apply to non-price terms of sale unless their only "practical effect" is to establish discriminations in price.  *Corn Products*, 324 U.S. at 740.  As described in the complaint, however, the POS program principally changes the *timing* of a parts manufacturer's sales to AutoZone, not their price.  And it makes little sense to say that the only practical effect of the program is to facilitate price discrimination, because the complaint expressly alleges that through the program, AutoZone and the parts manufacturers renegotiated the risk of loss before a part has been sold—an obvious, non-price term.  To put things in elementary financial terms, the POS program resembles an extension of credit from the manufacturers to AutoZone, in the form of free use of inventory.  But, leaving aside the complaint's conclusory allegation that AutoZone is not creditworthy, that is a practice Robinson-Patman does not regulate.  *See Kline*, 878 F.2d at 796; *Bouldis*, 711 F.2d at 1325; *Craig*, 515 F.2d at 224.[12]

---

[12] The complaint alleges in the alternative that "the POS program is a promotional program . . . that is being used to resell the Manufacturer's auto parts to end users and jobbers by giving AutoZone (i) a larger, more complete inventory of auto parts and lines, (ii) lower per-unit costs . . . , (iii) financing to enable AutoZone to increase its number of retail stores, and (iv) a high profit margin on sales to enable AutoZone to obtain capital for additional expansion costs . . . ."  (Compl. 126A.)  But this contention fails for the same reason noted in the text.  As described in the complaint, the POS program is a financing program, not an "advertising, promotional, or merchandising" service.

The Court reaches similar conclusions concerning Wal-Mart's RFID program.  As already noted, the complaint alleges that defendants associated with Wal-Mart have violated the Act by developing and implementing an inventory control system that tracks shipping pallets using RFID technology.  Plaintiffs contend that the program violates Robinson-Patman because it reduces Wal-Mart's net cost of auto parts:  "[T]he manufacturers are taking a significant portion of the price they get for such auto parts from Wal-Mart and Sam's Club and giving it back to Wal-Mart and Sam's Club through these technology expenditures on behalf of Wal-Mart and Sam's Club."  (Pl.'s First Reply Mem. 31.)  Taking the complaint's description of the RFID program as accurate, there is no basis for concluding that the program requires manufacturers to charge discriminatorily low prices, or that the program has no practical effect other than lowering the prices manufacturers charge Wal-Mart.

Plaintiffs' claims under §§ 2(d) and (e), count IV, suffer an additional defect.  Plaintiffs en masse assert against all defendants that "[e]very paragraph in the vendor agreement has financial implications and the whole package is an advertising and promotional program for the distribution of the manufacturer's designated products through the retailer's distribution system," (Pl.'s Mem. 35), and that plaintiffs were not offered similar opportunities.  At this level of generality, however, the complaint provides no basis for concluding that any particular vendor agreement relates to "advertising, promotional, and merchandising services," a basic condition for liability under §§ 2(d) and (e).  Moreover aside from alleging that contracts were entered into, it provides no basis for concluding that the plaintiffs were all denied access to particular advertising and promotional opportunities.  While it is possible that at some point one among hundreds of plaintiffs was denied a promotional opportunity, no one plaintiff has alleged a plausible claim, much less all of them individually.  And the complaint provides no factual basis

for concluding that any of the plaintiffs were injured as a result of a denial of advertising or promotional resale opportunities.   Rule 8 requires "a short and plain statement of the claim *showing* that the pleader is entitled to relief," not conclusory allegations that defendants violate the law.

Yet another reason justifies dismissal of counts I, II, III, and IV for failure to state a claim.   The *Iqbal* case notes that determining whether a complaint states a claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."   *Ashcroft v. Iqbal*, 129 S. Ct. at 1950 (2009).   In this case, the Court draws upon the judicial experience of putting *Coalition I* through trial.   Although successive antitrust litigations under the Robinson-Patman act often escape preclusion, when an unsuccessful antitrust plaintiff re-files substantially the same complaint, the prior defeat diminishes whatever inferences of illegality can be drawn from that complaint.   So it does here.   These plaintiffs have had the benefit of discovery in the first action, which should increase their ability to plead sufficient factual matter in this action.   Yet they have failed to do so.

For the foregoing reasons counts I, II, III, and IV of the complaint fail to state a claim.

### III. CONCLUSION

Defendants' preclusion motion is granted in part and denied in part, and their motion to dismiss for failure to state a claim **[53]** is granted.  In a case such as this, the Court would ordinarily dismiss with prejudice and deny leave to amend, since plaintiffs have made numerous amendments to this point.  However, the Court is aware of the unique circumstances that give rise to this dismissal: the Court is dismissing a complaint filed prior to a change in the pleading standards on the basis of those new standards.  Accordingly, in an abundance of caution the Court defers decision on whether to grant leave to amend to allow plaintiff an opportunity to propose curative amendments.  Plaintiff has 30 days to so file.  The Clerk is directed to close this case.


SO ORDERED.

Dated: New York, New York
　　　　September 07, 2010

　　　　　　　　　　　　　　　　　　　　Richard J. Holwell
　　　　　　　　　　　　　　　　　　　United States District Judge